UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

LAURA MORAND,

                Charging Party,

                                                        Charge No.

    - against -

THE CITY OF NEW YORK,

                Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        Plaintiff Laura Morand ("Morand" or "plaintiff"), by her attorneys, Vladeck, Raskin & Clark, P.C., complains of defendant the City of New York ("the City" or "defendant") as follows:

NATURE OF THE ACTION

        1.      Morand is a successful and highly qualified information technology ("IT") professional with decades of experience in her field, including over 20 years as a City employee. Throughout her time with the City, Morand worked for the Fire Department of New York ("FDNY") in the Bureau of Technology Development Systems ("BTDS"). The BTDS oversees FDNY's information technology systems.

        2.      Throughout her long career with the City, Morand has received glowing performance reviews and consistent praise from managers and colleagues. Despite her success, however, the City has consistently refused to reward Morand for her efforts because she is Black.

        3.      Over the course of her tenure, the City has denied Morand, without basis, dozens of well-deserved promotions while affording preferential treatment to white and Asian employees in its hiring and promotional processes. In one particularly egregious example, the City

rejected Morand's application for a promotion for which she was qualified and hired a white man instead. That male employee lacked Morand's technical experience, tenure with FDNY, and, unlike Morand (who has a Master's Degree in her field), did not have a college degree.

4.  To make matters worse, the City has consistently underpaid Morand relative to her peers who are not Black. Since 2016, Morand has made at least $10,000 less per year than her non-Black peers with the same civil service title and a comparable level of experience with the City.

5.  Morand has repeatedly complained about FDNY's discrimination, to no avail. Not only did FDNY do nothing to remedy its pattern of discrimination, it also escalated its discrimination against Morand, including, in 2018, rejecting Morand without basis for 10 positions for which she applied.

6.  The discrimination against Morand is no surprise given FDNY's well-known legacy of race discrimination. Even in the face of multiple lawsuits over the past several decades credibly alleging systemic discrimination against Black employees, FDNY has done little to change its ways. FDNY continues to employ Black individuals at disproportionately low rates, particularly in more highly compensated professional roles.

7.  Plaintiff brings this action to remedy discrimination on the basis of her race in violation of Section 1981 of the Civil Rights Act of 1966, 422 U.S.C. §1981 ("Section 1981").

8.  Plaintiff also brings this action to remedy discrimination on the basis of her race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. (the "NYSHRL"); and the Administrative Code of the City of New York § 8-101 et seq. (the "NYCHRL").

9. In addition, plaintiff brings this action to remedy retaliation for her protected complaints in violation of the Section 1981, the NYSHRL, and the NYCHRL.

10. Plaintiff further brings this action to remedy pay discrimination on the basis of race in violation of New York Labor Law ("NYLL") § 194 and to remedy retaliation for her complaints of unlawful pay discrimination in violation of NYLL § 215.

11. Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, liquidated damages, reasonable attorneys' fees and costs of this action, pre- and post-judgment interest, and other appropriate relief pursuant to Title VII, Section 1981, NYSHRL, NYLL, and NYCHRL.

## JURISDICTION AND VENUE

12. Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343(a).

13. Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 because the City of New York, through FDNY, operates out of Brooklyn, New York; at all relevant times, Morand worked for FDNY in Brooklyn, New York; and a substantial part of the events or omissions giving rise to these claims occurred within this district.

14. This Court has supplemental jurisdiction over plaintiff's claims under the NYSHRL, NYLL, and the NYCHRL pursuant to 28 U.S.C. § 1367 because these claims closely relate to the federal claims, having arisen out of a common nucleus of operative facts, such that all claims form part of the same case or controversy.

15. Morand filed a charge with the United States Equal Opportunity Employment Commission (the "EEOC") on May 24, 2022.[1] On January 19, 2023, Morand received a notice of

---

[1] On December 1, 2017, a group of civilian employees of the Fire Department of New York filed a putative class action against the City for race discrimination; the case was dismissed on class certification grounds on May 12, 2021. See Richardson v. City of New York, No. 17-CV-9447

3

the right to sue from the EEOC. Plaintiff has complied fully with the administrative prerequisites of Title VII.

16. Pursuant to § 8-502(c) of the City Law, plaintiff will serve a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## BACKGROUND

17. Morand is a Black woman and a highly qualified IT professional with nearly three decades of experience in her field.

18. In addition to having a Bachelor's degree in Business Administration in Management Information Systems from Pace University, Morand also earned a Master's of Science in Information Systems Engineering from the NYU Polytechnic School of Engineering.

19. Morand's career as an IT professional with the City began in 2002. Before her work with the City, Morand worked for the State of New York for two years as an IT professional for the Worker's Compensation Board.

20. Throughout Morand's time with the City, she has worked for the Fire Department of New York ("FDNY") in the Bureau of Technology Development Systems ("BTDS"). The BTDS oversees FDNY's information technology systems.

21. Since 2015, Morand's title has been Computer Specialist Software Level II. In that role, Morand is responsible for reviewing and analyzing FDNY's current technology systems and applications to identify technological needs. Morand also drafts plans and technical

---

(JPO), 2021 WL 1910689, at *12 (S.D.N.Y. May 12, 2021) Morand's claims were tolled during the pendency of that action pursuant to American Pipe & Const. Co. v. Utah, 414 U.S. 538, 553 (1974). Further, Morand entered into a tolling agreement with the City effective March 3, 2022. This agreement terminated on May 24, 2022.

1282400 v1

specifications for new systems or applications and manages the implementation of those systems. In addition, Morand writes manuals instructing users on the new systems and applications. Morand also responds to requests from users who require technical support. This role requires Morand to have a broad understanding of all systems FDNY employs as well as FDNY's technical needs.

22. Although the City did not provide Morand with written performance evaluations every year, the performance reviews she did receive at BTDS have been consistently excellent.

23. For example, in early 2017, Morand received a glowing review for her performance in 2016 (the last year for which she received a formal review). In that review, Morand's manager wrote that Morand's "many years of IT experience and keen knowledge of FDNY operations" was a "tremendous source of institutional knowledge." He also wrote that Morand was "great with drafting technical documentation that more than meets the needs of the business stakeholders" and that she had a "keen sense in projecting what their future needs will be." The review further praised Morand for "ser[ving] as a constant source of support" and "go[ing] out of her way to make sure her stakeholder[']s business needs are met." That performance review concluded by stating that Morand had a "natural rapport with people" and lauding her interpersonal skills as a "great asset."

24. In the prior year, the first full year in which Morand served in her current role, Morand's performance review was similarly excellent. In that review, she received a rating of "very good" or "good" in all applicable categories.

25. In addition, the technology users Morand serves as an IT professional have often praised her work.

1282400 v1

26. Because of the City's discrimination against Morand and failure to appropriately handle her complaints, as explained in more detail below, in late 2017, Morand began working full-time for her union. In 2018, Morand was elected President of the union, a role in which she currently serves.

27. As a union representative, Morand continues to hold her civil service title of Computer Specialist Software II. In addition, pursuant to the City's policy, the City continues to pay Morand's salary, which is based on her most recent rank and title before she became a union representative.

The City Refuses to Promote Morand

28. Throughout her 20 years as a civil servant, Morand has applied for dozens of promotional opportunities. Even though Morand was qualified for each promotion for which she applied, the City rejected her on all but one occasion.[2]

29. The City's persistent rejection of Morand's applications for promotion was unjustified especially in light of her long and successful career with BTDS and excellent qualifications. In contrast, Morand's non-Black colleagues who were less qualified and experienced regularly received promotions. While Morand has a Master's degree in her field, her white and Asian colleagues who received promotions did not.

30. For example, in August 2016, Morand applied for the role of Senior Business Analyst, a position for which Morand met all of the qualifications. Without even interviewing her, the City rejected her application in 2017. In or around June 2017, Morand learned that the City hired for that position a white man who does not share Morand's technical experience

---

[2] In 2014, after 12 years with the City, the City finally promoted Morand to the position of Computer Specialist Software Level II, the position she currently holds. The promotion became effective January 13, 2015.

1282400 v1

and does not have a college degree, let alone a Master's degree. That male employee was unsuccessful in that position and left after a year and a half.

31. Morand was shocked when she learned that the City had hired this much less qualified male employee over her. Morand asked her then-manager, Shahadat Patwary ("Patwary"), a man who is not Black, why he had not interviewed her for the role. Patwary told Morand, in sum and substance, that he did not know that Morand had applied. Patwary's explanation made no sense. As with all applications for jobs at FDNY, Morand applied through the City's online portal for the Senior Business Analyst role. Patwary also told Morand, in sum and substance, not to worry about the position because there would be more opportunities.

32. On information and belief, Patwary was later forced to leave FDNY because he had been credibly accused of discrimination by another employee, a Hispanic man.

33. As described in more detail below, the City doubled down on its efforts to block Morand's promotional opportunities after she spoke out about its discrimination against her, including, as described below, her complaint to the Office of Diversity and Inclusion in 2017.

### The City Consistently Underpays Morand

34. In addition to discriminating against Morand by not promoting her, the City has underpaid her relative to colleagues who are not Black.

35. The City promoted Morand to her current position in 2014, effective January 2015. When Morand received that promotion, the City raised her salary by four percent. As a result of the four percent raise, Morand earned the minimum salary for a level II computer specialist allowed under the collective bargaining agreement that governed her employment.

36. On information and belief, Morand's colleagues who are not Black received raises of at least eight percent when the City promoted them to Morand's level.

37. Since 2016, other computer specialists at Morand's civil service level with comparable tenure who are not Black made, on average, at least $10,000 more per year than Morand.

38. For example, in 2018 Morand's salary was $91,392. The average salary for non-Black computer specialists who had been with FDNY since at least 2005 was $104,530.

39. This pay disparity affected not only Morand's base pay, but also her rate of pay for overtime work (for which she was eligible) and her pension contributions. As a result, Morand has lost hundreds of thousands of dollars over the course of her career due to the City's discriminatory pay practices.

40. The City's discriminatory pay practices continue to affect Morand's compensation. Although Morand's current responsibilities are as a Union President, the City's policy is to compensate union officials at their most recent civil service rank and title. Accordingly, Morand is compensated as a Computer Specialist Software Level II and, on information and belief, continues to make significantly less money than her counterparts with that rank and title who are not Black.

41. After Morand was elected Union President, she told Patway, her then-manager, that she had been offered the position of Union President and that she would agree to return to her BTDS role if the City would consider increasing her salary. Patway told her that there was nothing he could do. Morand is aware of employees who are not Black to whom FDNY offered salary increases to stay with FDNY instead of accepting competing job offers.

<u>Morand's Discrimination Complaints</u>

42. Morand has consistently complained about FDNY's discriminatory practices. FDNY has failed to address those concerns.

8

43. In the early 2010s, Morand complained to David Zweifler ("Zweifler"), the Deputy Director of Labor Relations for FDNY, who is white. Morand raised concerns that she believed FDNY was underpaying her relative to her non-Black coworkers and that she believed FDNY had a pay disparity problem. Incredibly, Zweifler responded to Morand that he reviewed the salary data and determined that there was no pay disparity.

44. Also in the early 2010s, Morand spoke multiple times with Margie Dominguez ("Dominguez"), an FDNY Human Resources ("HR") administrator who is not Black, about Morand's pay. Morand complained to Dominguez that she believed that the City was underpaying her. Dominguez similarly dismissed Morand's concerns. Dominguez told Morand on multiple occasions that she was "lucky" to have a job.

45. Around the same time, Morand spoke to her then-manager, John Adams ("Adams"), who is white. Morand similarly complained that she believed that the City was underpaying her. Adams told Morand, in sum and substance, that he wanted to raise Morand's compensation, but that there was nothing he could do.

46. After the City rejected Morand for the Senior Business Analyst position and hired a much less qualified white man in summer 2017, Morand also complained to FDNY's newly-created Diversity and Inclusion office about race discrimination. Morand told FDNY's Chief Diversity Officer, Cecilia Loving ("Loving"), that the City had not promoted Morand because of her race. Loving and Morand discussed Morand's history at FDNY, her qualifications, and the many promotional opportunities for which the City rejected her.

47. A couple of weeks after Morand spoke to Loving, Loving interviewed Morand as part of a purported investigation of Morand's complaint. After Morand repeated her complaint in detail to Loving, Loving told Morand, in sum and substance, that there was nothing

9

she could do about her discrimination concerns and promised that there would be more opportunities. On information and belief, Loving and the Diversity and Inclusion office did not take any other action in response to Morand's complaint.

### The City's Continued Failures to Promote Morand

48. Following Morand's complaints, the City stepped up its efforts to prevent Morand from achieving the promotional opportunities she deserved.

Morand's Multiple Applications for Promotion in Summer 2018

49. Even after Morand began to work for the union, she continued to apply for promotional opportunities within BTDS and elsewhere at FDNY that would allow Morand to use her technology skillset and grow her career as a technology professional.

50. Most recently, in July 2018, Morand applied for 10 positions. Morand met the qualifications for each of these positions, including, where required, taking and passing civil service examinations specific to the role. Even though Morand was qualified, the City rejected her applications without even interviewing her for all but two of those positions. As to the other two positions, the City interviewed Morand but then rejected her without explanation.

The Open Competitive and Promotional Lists

51. The City has also passed Morand over for promotions for which she is eligible based on her ranking on the City's open competitive and promotional lists.

52. The open competitive list and the promotional list are lists of current City employees who are eligible for certain job opportunities; employers at City agencies review the list and invite qualified employees to interview for open positions. The City debuted these lists in or around 2020.

53. Employees qualify for placement on the open competitive list based on their prior experience and their score on the City's open competitive examination. Employees qualify for placement on the promotional list based on their current job title and their score on the City's promotional examination.

54. Morand received a perfect score on both the open competitive and the promotional examinations and has been on both lists since the City began using them in 2020.

55. Despite Morand's qualifications, the City has never asked her to interview for a position based on her placement on the open competitive list. Since the City began using the open competitive list in 2020, Morand is aware of many white and Asian employees who have received interviews and job offers by virtue of their positions on the open competitive list. Morand is not aware of any Black employee who the City has invited to interview for a job. Nor is Morand aware of the City offering a job from the open competitive list to a Black employee. On information and belief, there are thousands of employees on the open competitive list, including many Black employees.

56. In addition, the City offered Morand an opportunity for promotion based on her position on the promotional list only once. Although the City finally offered to promote Morand to a computer systems manager position based on the promotional list in 2020, this purported promotion would have required her to take a $6,000 pay cut from her current position. There was no legitimate justification for the salary that the City offered Morand. As explained below, Morand was already underpaid for her current rank and title, let alone for a higher position. The City refused to increase its offer in response to Morand's request that it at least match her current salary.

1282400 v1

FDNY's Systemic Pattern of Race Discrimination

57. The City's discrimination against Morand is consistent with a historic and well-known pattern of race discrimination within FDNY.

58. For example, during the past 50 years, FDNY applicants have successfully brought two large class actions alleging that the City discriminated against Black applicants in hiring firefighters. The first, Vulcan Society of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n, resulted in an injunction that required the City to, among other things, ensure that at least 25% of the new hires for firefighter positions be racial minorities.[3] The injunction lapsed in 1977, and following the expiration of the injunction, the City apparently abandoned efforts to ensure diversity in its hiring of firefighters.

59. In 2007, the New York City faced another lawsuit from Black applicants for firefighter positions.[4] By that time, Black firefighters constituted only 3.4% of the force.[5] That case settled in 2015, and the settlement required the City to, among other things, appoint for the first time a Chief Diversity and Inclusion Officer.

60. Although FDNY has made some progress in hiring Black firefighters since the 2015 settlement, Black employees remain wildly underrepresented in FDNY's overall workforce, including in its civilian workforce of which Morand is a part.

---

[3] Vulcan Society of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n, 360 F. Supp. 1265, 1269 (S.D.N.Y.), aff'd in relevant part, 490 F.2d 387, 391 (2d Cir. 1973).

[4] United States v. City of New York, 683 F. Supp. 2d 225, 241 (E.D.N.Y. 2010).

[5] Id.

1282400 v1

61. In 2017, a group of plaintiffs filed a class action alleging race discrimination in the City's civilian hiring and pay practices.[6] The lawsuit alleged, among other things, a pattern of discriminatory practices in BTDS, the division in which Morand worked. While that lawsuit was dismissed, the Court dismissed it on procedural grounds rather than based on the merits of the claims.

62. The City's discriminatory hiring practices unsurprisingly did not abate following the filing of that lawsuit. In 2020 (the most recent year for which such data is publicly available), even though approximately 23.4% of New York City residents were Black,[7] Black employees made up only 13% of FDNY's total workforce.[8] FDNY was even less diverse than the City workforce as a whole; in 2020, 29% of City employees were Black.[9]

63. Morand has observed an even more pronounced disparity at BTDS, the division in which she worked. BTDS has approximately 150 employees. At any given time during Morand's employment, BTDS had fewer than 10 Black employees, including Morand. Of the few Black employees in BTDS, the vast majority of them typically worked in much lower paying clerical roles. Throughout Morand's time at BTDS, Morand is one of a handful of Black BTDS employees in a professional role.

---

[6] Richardson, 2021 WL 1910689, at *12. The lawsuit was dismissed on class certification grounds in May 2021. Id.

[7] QuickFacts: New York City, New York, United States Census Bureau, available at https://www.census.gov/quickfacts/fact/table/newyorkcitynewyork/POP010220#POP010220.

[8] Workforce Profile Report for FY 2020, Department of Citywide Administrative Services for the City of New York, available at https://dcas.shinyapps.io/WFPR2020/.

[9] Id.

1282400 v1

## FIRST CAUSE OF ACTION
### Race Discrimination Under Title VII

64. Plaintiff repeats and realleges paragraphs 1 to 63 of this Complaint as if fully set forth herein.

65. By the acts and practices described above, the City has discriminated against plaintiff in the terms and conditions of her employment based on her race in violation of Title VII.

66. The City has acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

67. As a result of the City's discriminatory acts, plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damage, mental anguish, emotional distress, humiliation and other compensable damage.

## SECOND CAUSE OF ACTION
### Race Discrimination Under Section 1981

68. Plaintiff repeats and realleges paragraphs 1 to 67 of this Complaint as if fully set forth herein.

69. By the acts and practices described above, defendant has discriminated against plaintiff in the terms and conditions of her employment in violation of Section 1981.

70. The City has acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

71. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer economic damage, irreparable injury, emotional distress, reputational injury and other compensable damages.

## THIRD CAUSE OF ACTION
## Retaliation Under Section 1981

72. Plaintiff repeats and realleges paragraphs 1 to 71 of this Complaint as if fully set forth herein.

73. By the acts and practices described above, defendant has retaliated against plaintiff in the terms, conditions, and privileges of her employment for her opposition to unlawful practices in violation of Section 1981.

74. The City has acted with malice and/or reckless indifference to plaintiff's statutorily protected rights.

75. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer economic damage, irreparable injury, emotional distress, reputational injury, and other compensable damages.

## FOURTH CAUSE OF ACTION
## NYSHRL Race Discrimination

76. Plaintiff repeats and realleges paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77. By the acts and practices described above, defendant has discriminated against plaintiff in the terms and conditions of employment on the basis of her race in violation of NYSHRL.

78. Defendant acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

79. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

1282400 v1

## FIFTH CAUSE OF ACTION
## Retaliation under the NYSHRL

80. Plaintiff repeats and realleges paragraphs 1 through 79 of this Complaint as if fully set forth herein.

81. By the acts and practices described above, defendant has retaliated against plaintiff for her opposition to unlawful employment practices in violation of NYSHRL.

82. The City has acted with malice and/or reckless indifference to plaintiff's rights protected under state law.

83. As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

## SIXTH CAUSE OF ACTION
## Discrimination under the NYLL

84. Plaintiff repeats and realleges paragraphs 1 through 83 of this Complaint as if fully set forth herein.

85. By the acts and practices described above, defendant has discriminated against plaintiff by paying employees who are not Black higher wages than plaintiff was paid for equal work in a job, the performance of which required equal skill, effort, and responsibility, and which was performed under similar working conditions, in violation of the New York State Labor Law.

86. Defendant's unlawful actions were not in good faith within the meaning of the Labor Law.

87. Plaintiff suffered lost wages as a result of defendant's willful and unlawful conduct.

## SEVENTH CAUSE OF ACTION
### Retaliation Under the NYLL

88. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 87 of this Complaint as if set forth herein.

89. By the acts and practices described above, defendant retaliated against plaintiff for engaging in protected activity under the NYLL.

90. Defendant's conduct showed reckless disregard for plaintiff's statutorily protected rights under the NYLL.

91. Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## EIGHTH CAUSE OF ACTION
### NYCHRL Race Discrimination

92. Plaintiff repeats and realleges paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93. By the acts and practices described above, defendant has discriminated against plaintiff in the terms and conditions of employment on the basis of her race in violation of NYCHRL.

94. Defendant discriminated against plaintiff with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

95. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

1282400 v1

## NINTH CAUSE OF ACTION
### Retaliation Under the NYCHRL

96. Plaintiff repeats and realleges paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97. By the acts and practices described above, defendant has discriminated against plaintiff for her opposition to unlawful employment practices in violation of NYCHRL.

98. Defendant retaliated against plaintiff with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

99. As a result of defendant's retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, reputational injury and other compensable damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a) Declaring that the acts and practices complained of herein violate Title VII, Section 1981, the NYSHRL, the NYLL, and the NYCHRL;

(b) Enjoining permanently restraining defendants from violating Title VII, Section 1981, the NYSHRL, the NYLL, and the NYCHRL;

(c) Directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) Awarding plaintiff damages to make her whole for all earnings she would have received but for defendant's discriminatory and retaliatory treatment, including, but not

limited to, wages, commissions, bonuses, pension and retirement, health care coverage and other lost benefits including future lost wages and benefits;

(e) Awarding plaintiff compensatory damages for mental anguish, emotional distress, humiliation, and damage to reputation;

(f) Directing defendant to pay an additional amount as punitive damages for its willful and/or reckless disregard of plaintiff's statutory rights;

(g) Directing defendant to pay a liquidated damages for its willful violation of plaintiff's rights under NYLL §§ 194 and 215;

(g) Awarding plaintiff damages to compensate for any adverse tax consequences;

(h) Awarding pre-judgment interest;

(i) Awarding plaintiff attorneys' fees, costs and disbursements;

(j) Awarding plaintiff such additional relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
April 17, 2023

VLADECK, RASKIN & CLARK, P.C.

By: _____
Jeremiah Iadevaia
Emily Bass
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300

1282400 v1